UNITED STATES of America,

v.

**BEL–MAR LABORATORIES, INC., a corporation, and Morris Schechter, an individual, Defendants.**

**No. 67–CR–378.**

United States District Court
E. D. New York.

May 20, 1968.

Bass & Friend, New York City, for defendants (Sheldon S. Lustigman, New York City of counsel).

Joseph P. Hoey, U. S. Atty. for Eastern District of New York (Robert Kraft, Esq., Asst. U. S. Atty., Brooklyn, N. Y., of counsel, for the Government.

### Memorandum of Decision and Order

MISHLER, District Judge.

Defendants have been charged under a fourteen count information with having

unlawfully introduced or delivered for introduction into interstate commerce various misbranded and adulterated injectable drugs in violation of section 331 (a) of title 21, United States Code.[1]

The odd numbered counts of the information contain the allegations that the drugs were adulterated, while the charges of misbranding are set forth in the even numbered counts.

The government contends that all of the subject drugs were adulterated within the meaning of section 351(a) (2) (B) of title 21, in that " * * * the methods used in, or the facilities or controls used for, * * * [their] manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such * * * [drugs meet] the requirements of this chapter as to safety and * * * [have] the identity and strength, and * * * [meet] the quality and purity characteristics, which * * * [they purport] or * * * [are] represented to possess * * *."

In addition, the government asserts that the drugs referred to in counts seven, nine and thirteen were also adulterated within the meaning of section 351(c), in that their strength differed from, or their purity or quality fell below, that which they purport or are represented to possess.[2]

The misbranding charges are to the effect that certain allegedly false and misleading statements are contained in the labeling of the subject drugs. Counts two and four charge that certain statements on the ampule labels were inconsistent with statements on the carton labels.[3] Count four also complains that the labeling of the particular drug in question lacked adequate directions for the use of a prescription drug, and failed to bear any statement of the route of administration, as required by the regulations of the Food and Drug Administration.[4] In counts six, eight, ten and fourteen the alleged misstatements relate to the strengths and qualities of the various drugs. Finally, in count twelve the government maintains that the carton insert did not relate to the drug with which it was used, but rather to a different drug.

Defendants, in turn, have made the following set of motions: (1) a motion to dismiss various counts of the information, on several grounds, pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure; (2) an application for the convening of a three-judge district court under section 2282 of title 28; (3) a motion for an order permitting defendants to obtain both copies of the government's scientific analyses upon which this proceeding has been based, and representative samples of the allegedly objectionable printed material and drugs, pursuant to Rule 16(a) (2) of the Federal Rules and section 372(b) of title 21; (4) a motion for discovery and inspection of any statements made by defendants that are within the government's possession, custody or control, and of various labels and carton inserts pertinent to the charges of misbranding, pursuant to Rule 16; and (5) a motion for a bill of particulars pursuant to Rule 7 (f).

1. § 331. *Prohibited acts*
   The following acts and the causing thereof are prohibited:

   (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded.

   *   *   *   *   *   *   *   *

2. Count seven charges that while a drug contained in several vials labeled in part, "Multiple Dose 30 cc. Vial Hepviron," purportedly was suitable for intramuscular injection, in fact, it was contaminated with viable microorganisms. The charges of adulteration under section 351 (c) that are contained in counts nine and thirteen concern alleged variations from purported strength.

3. The former indicated that the drug was for intramuscular use only, but the latter indicated intravenous use only.

4. 21 C.F.R. § 1.106(b) (2) (iii) (1968).

The motion to dismiss is directed against ten of the fourteen counts of the information, and is based upon several distinct theories, none of which is applicable to all of the challenged counts. First, defendants attack all of the odd numbered counts on the ground that section 351(a) (2) (B), which is the sole statutory predicate for four out of the seven odd numbered counts, is unconstitutional. More specifically, they argue that said section is devoid of any definite, certain or ascertainable standards with which one could determine whether the methods being used in, or the facilities or controls being used for the manufacture, processing, packing or holding of a particular drug conform to, or are being operated or administered in conformity with "current good manufacturing practice." As a result, they contend, the section is too vague, indefinite and uncertain under the fifth amendment, and fails to inform defendants to the nature and cause of the charges based thereon, in violation of the sixth amendment.

Second, defendants assert that all of the odd numbered counts are defective in that they are merely couched in the language of the statute; they are vague, indefinite and uncertain; and they fail to charge or aver that defendants committed any acts constituting an offense under any federal statute.

Third, defendants also move to dismiss counts nine, ten, thirteen and fourteen on the ground that said counts fail to allege any facts to show that defendant's drugs do not fall within the permissible variations or exemptions envisaged by section 352(b) of title 21.[5] And finally, defendants attack counts eight, ten and fourteen as duplicitous.

As a concomitant to their challenge to the constitutionality of section 351(a) (2) (B), defendants request the convening of a three-judge court for the stated purpose of securing a permanent injunction restraining the enforcement, operation or execution of said section as against them.[6] Injunctive relief is unnecessary in this case, however, since defendants have an adequate available legal remedy with which they may place the pertinent section's constitutionality at issue and, thereby, attempt to prevent its use against them—their pending motion to dismiss the relevant counts of the information. The provision for the convening of a three-judge court and direct appeal to Supreme Court was never intended to apply to all situations where the validity of an act of Congress is drawn into question. See, Flemming v. Nestor, 363 U.S. 603, 607, 80 S.Ct. 1367, 1371, 4 L.Ed.2d 1435 (1960). Moreover, even assuming that a three-judge court might be called under similar circumstances, this court would still refuse to convene such a panel because, for the reasons hereinafter stated, defendants' claim of unconstitutionality is insubstantial. See, Ex Parte Poresky, 290 U.S. 30, 54 S.Ct. 3, 78 L.Ed. 152 (1933); Utica Mut. Ins. Co. v. Vincent, 375 F.2d

5. 21 U.S.C. § 352(b) (2) (1964):
   A drug or device shall be deemed to be misbranded—
   &ast; &ast; &ast; &ast; &ast;
   (b) If in package form unless it bears a label containing (1) the name and place of business of the manufacturer, packer, or distributor; and (2) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count: *Provided,* That under clause (2) of this subsection reasonable variations shall be permitted, and exemptions as to small packages shall be established, by regulations prescribed by the Secretary.

6. 28 U.S.C. § 2282 (1964):
   § 2282. Injunction against enforcement of Federal statute; three-judge court required.
   An interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge thereof unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

129, 130 (2d Cir.), cert. denied, 389 U.S. 839, 88 S.Ct. 63, 19 L.Ed.2d 102 (1967).

■ It is well settled that a penal statute must fix an ascertainable standard of guilt, and must adequately inform the accused of the nature and cause of the charge against him. See, United States v. Wiesenfeld Warehouse Co., 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964); Boyce Motor Lines v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952); Jordan v. De George, 341 U.S. 223, 231, 71 S.Ct. 703, 707, 95 L.Ed. 886 (1951); United States v. L. Cohen Grocery Co., 255 U.S. 81, 89, 41 S.Ct. 298, 300, 65 L.Ed. 516 (1921); United States v. Woodward, 376 F.2d 136, 140 (7th Cir. 1967).

■ While an act of Congress that has been attacked as vague must initially be examined "on its face", United States v. National Dairy Prods. Corp., 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963), few words possess mathematical precision, and most statutes deal with untold and unforeseen factual variations. Boyce Motor Lines v. United States, supra. Thus, such scrutiny frequently fails to uncover a readily discernible dividing line between validity and invalidity. United States v. National Dairy Prods. Corp., supra.

■ In recognition of such factors, the constitution does not require an impossible degree of specificity. Rather "[t]he test is whether the language conveys sufficiently definite wording as to the proscribed conduct when measured by common understanding and practices." Jordan v. De George, supra 341 U.S. at 231–232, 71 S.Ct. at 708. Moreover, a strong presumption of validity attaches to an act of Congress, and "* * * statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." United States v. National Dairy Corp., supra. See also,

United States v. Irwin, 354 F.2d 192, 196 (2d Cir. 1965), cert. denied, 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966). No more than a reasonable degree of certainty, viewed in light of the conduct charged, can be demanded. United States v. National Dairy Prods. Corp., supra 372 U.S. at 32, 83 S.Ct. at 598; Boyce Motor Lines v. United States, supra 342 U.S. at 340, 72 S.Ct. at 330–331.

Section 351(a) (2) (B), the particular provision in issue, was enacted as part of the 1962 amendments to the Food, Drug and Cosmetic Act of 1938,[7] a piece of legislation that touches "* * * phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection." United States v. Dotterweich, 320 U.S. 277, 280, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943). Indeed, in the area of food and drug legislation, Congress has not always chosen to make guilty intent a prerequisite to the imposition of criminal sanctions. See, United States v. Wiesenfeld Warehouse Co., supra 376 U.S. at 91, 84 S.Ct. at 563. Instead, Congress has often determined that the larger good demands that the burden of acting at one's hazard be placed upon persons, who though they might otherwise be innocent, occupy a responsible position relative to a public danger. The reasoning has been that it is preferable to place hardships "* * * upon those who have at least the opportunity of informing themselves of the existence of conditions imposed for the protection of consumers before sharing in illicit commerce, rather than to throw the hazard on the innocent public who are wholly helpless." United States v. Dotterweich, supra 320 U.S. at 285, 64 S.Ct. at 138.

■ The 1962 amendments were intended to strengthen and broaden the Act by effecting better, safer medicine and a more effective system of enforcement.[8] More specifically, the purpose of

7. 21 U.S.C. § 301 et seq. (1964).

8. 1962 U.S.Code Cong. & Adm.News, at p. 2884.

section 351(a) (2) (B) was to attack commerce in unsafe and unreliable[9] drugs in its incipiency by giving the Food and Drug Administration (FDA) "* * * additional authority to require that sound methods, facilities, and controls be used in all phases of drug manufacturing and distribution."[10] Thus, under the subject section a drug is deemed to be adulterated if the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacture practice to assure that such drug is safe and reliable, regardless of whether the drug actually is deficient in some respect.[11]

The real question posed by defendants' motion to dismiss, therefore, is whether section 351(a) (2) (B) affords them a standard with which they can ascertain whether they are contravening the statutory scheme. See, United States v. L. Cohen Grocery Co., supra 255 U.S. at 92, 41 S.Ct. at 301.

Defendants rely heavily on two cases in particular, United States v. L. Cohen Grocery, supra and Connally v. General Constr. Co., supra. The former involved section 4 of the Lever Act,[12] which proscribed, *inter alia*, unjust, unreasonable or excessive rates or charges in the handling or dealing in any necessaries. In holding the statute void for vagueness and quashing the indictment, the Supreme Court said that no standard of any sort was afforded thereby, and that the legislation amounted to penalizing and punishing all acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury. Indeed, the Court's opinion was buttressed by the conflicting results in the cases then at bar. United States v. L. Cohen Grocery Co., supra 255 U.S. at 89–90, 41 S.Ct. at 300.

In the latter case, a state statute prohibiting the payment of "* * * less than the current rate of per diem wages in the locality where the work is performed" was declared unconstitutional because of two serious ambiguities: (1) the legislature incorrectly assumed that there actually was such a rate while, in fact, there were many gradations; (2) the term "locality," the Court said, was subject to varying interpretations. Connally v. General Constr. Co., supra 269 U.S. at 393–395, 46 S.Ct. at 128–129, 70 L.Ed. 322.

Aside from the fact that these cases predated a change in the Court's attitude toward governmental regulation of the economy, both rest upon determinations that under the circumstances the respective statutes afforded no meaningful standards at all. This court concludes that such is not the case with the provision presently under scrutiny,[13] and several more recent cases upholding anal-

---

9. The FDA uses the term "reliable" to refer to drugs having the identity and strength, and meeting the quality and purity characteristics which they purport or are represented to possess. See, Note, The Drug Amendments of 1962, 38 N.Y. U.L.Rev. 1104 (1963).

10. 1962 U.S.Code Cong. & Adm.News, at p. 2890.

11. See note 10, supra.

12. Food Control Act of 1917, 40 Stat. 276 (1917), as amended, 41 Stat. 297 (1919).

13. A third case relied upon by defendants, United States v. Cardiff, 344 U.S. 174, 73 S.Ct. 189, 97 L.Ed. 200 (1952), is even more clearly distinguishable. In that case the defendant challenged section 301(f) [21 U.S.C. § 331(f)] of the subject Act, which section prohibited the refusal to permit entry or inspection as authorized by section 704 [21 U.S.C. § 374]. The latter section authorized federal employees to enter and inspect factories at reasonable times after first making request and obtaining permission of the owner, operator or custodian. When the defendant refused to grant such permission, he was charged with a violation of section 301(f). The Court held that the statute failed to give the defendant fair warning that his refusal was unlawful because, by referring to section 704, it appeared to give him the right to withhold his permission.

ogous sections of the Food, Drug and Cosmetic Act support this view.

Two of the cases, Berger v. United States, 200 F.2d 818 (8th Cir. 1952) and Golden Grain Macaroni Co. v. United States, 209 F.2d 166 (9th Cir. 1953), involved the validity of section 342(a) (4) of title 21,[14] while two others, United States v. Wiesenfeld Warehouse Co., supra and United States v. Sullivan, 332 U.S. 689, 68 S.Ct. 331, 92 L.Ed. 297 (1948), dealt with alleged violations of section 331(k).

Section 342(a) (4) provides that "[a] food shall be deemed to be adulterated * * * if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health * *." In sustaining this enactment against a claim of indefiniteness, the *Berger* court remarked that

> the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. The criterion of criminality is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.

Berger v. United States, supra 200 F.2d at 822. See also, Nash v. United States, 229 U.S. 373, 377, 33 S.Ct. 780, 781, 57 L.Ed. 1232 (1913).

Section 331(k) prohibits "* * * [t]he adulteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing [or causing] of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded." In the *Wiesenfeld Warehouse* case, the Government charged that the defendant,

a public storage warehouseman, had held certain food under insanitary conditions, thus causing it to be deemed adulterated within the meaning of section 342(a) (4). The Court held that since section 342(a) (4) "* * * defines with particularity an explicit standard of conduct * * *," section 331(k), read together with said definition of food adulteration, gives ample warning of what is prohibited.

In the *Sullivan* case, on the other hand, the defendant, a retail druggist, was prosecuted for misbranding. The Government alleged that a drug which the defendant had been holding for resale had not borne "* * * adequate directions for use * * * [and] adequate warnings against use * * * dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as are necessary for the protection of users * * *." 21 U.S.C. § 352(f) (1964). The Court found no ambiguity in either section 331(k) or 352(f). Although the majority recognized that one could envision extreme possible applications, it noted that there would be ample opportunity to consider such contingencies should they ever arise and appeared to indicate the nature of the enforcement that it expected from the agency. "* * * [T]he Administrator of the Act is given rather broad discretion," the court said, "broad enough undoubtedly to enable him to perform his duties fairly without wasting his efforts on what may be no more than technical infractions of law." United States v. Sullivan, supra at 694, 68 S.Ct. at 335.

The standard contained in section 351 (a) (2) (B), i. e., the employment of such current good manufacturing practice as will assure that a particular drug is safe and reliable, is at least as definite as those that were sustained in the aforementioned cases.[16] The requisite

---

14. See also, United States v. Gnome Bakers, Inc., 135 F.Supp. 273, 274 (S.D. N.Y.1955).

16. Contra, Pendergast & McMurray, The Constitutionality of the Good Manufacturing Provision of the Federal Food, Drug

conditions are not demanded in the abstract, but rather are expressly related to the achievement of a specified goal—the assurance that drugs will be safe and reliable. See, Note, 38 N.Y.U.L. Rev., supra at 1107. The fact that the standard may vary in degree does not render it unconstitutional. See, e. g., United States v. Henderson, 73 App.D.C. 369, 121 F.2d 75 (1941).

This Court might well have required a more definite standard had this case involved first amendment freedoms. In such instances, vagueness itself may effectively deter constitutionally protected and socially desirable conduct. See United States v. National Dairy Prods. Corp., supra 372 U.S. at 36, 83 S.Ct. at 599–600; United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). In the present proceeding, however, neither of these tests has been met because the section is directed at manufacturing practices which fail to assure that certain drugs will be safe and reliable.

Furthermore, the phrase "current good manufacturing practice" is not strange to those in the trade to whom the subject section is directed. As far back as 1948–49, the FDA attempted to implement the Act by instituting a cooperative educational effort. After inspecting numerous drug manufacturing plants and holding conferences, the agency labeled the industry's more progressive practices as "good manufacturing practices." As long as compliance remained voluntary, however, there was much variation.[17]

Following the 1962 amendments, the FDA continued its program of education, inspection and voluntary compliance. In addition, it promulgated interpretive regulations which are at least as definite as the criteria contained in section 352 (f) that were approved of in the Sullivan case.[18] These regulations are intended to set minimum requirements, and seem to have been welcomed by some in the industry because they serve to focus attention on the problem areas, and to guide in the evaluation of a product's integrity. See, Williams, Counsel's Role in Current Good Manufacturing Practice, 23 Food, Drug, Cosm.L.J. 71 (1968).

Thus, this is not a case where there is no meaningful referent in business practice or usage, see, United States v. L. Cohen Grocery Co., supra, or where there are no regulations in point available for guidance. See, United States v. Fabro, Inc., 206 F.Supp. 523 (M.D. Ga.1962). Indeed, the drug industry has actively participated in the regulatory process, and the regulations emerging therefrom have been carefully considered. See, also, Boyce Motor Lines v. United States, supra 342 U.S. at 341–342, 72 S.Ct. at 331.

But perhaps even more significantly, section 351(a) (2) (B) pertains to an industry where manufacturing practices are in a state of constant change, and wherein there are thousands of widely differing and complex products which are processed in a myriad of establishments under infinitely differing circumstances. See, William, supra. In determining the sufficiency of a particular standard applicable to such an industry, the courts must necessarily consider these practicalities. See, Boyce Motor Lines v. United States, supra at 340, 72 S.Ct. at 330–331. Cf. Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967). As a matter of fact, there are responsible segments of opinion within the industry itself which oppose a greater degree of specificity in this area. See, Williams, supra; Barnard, Good Manufacturing Practices Regulations in

and Cosmetic Act, 23 Business Lawyer 445 (1968).

17. FDA Papers, Good Manufacturing Practice: Another Step Toward Compliance, April, 1967.

18. 21 C.F.R. § 133.1 et seq. (Jan. 1, 1967). For the legislative history relating to the effect of these regulations, see Sen.Rep. No. 1744 (1962).

the Food Industry, 22 Food, Drug. Cosm. L.J. 511, 514 (1967).

Defendants also attack the sufficiency of the odd numbered counts on the grounds of vagueness, and failure to allege specifically in what respect they failed to observe current good manufacturing practice.

■■■ An indictment or information must sufficiently apprise the accused of the charge against him so that he will be able to prepare his defense and avail himself of his double jeopardy right against a further prosecution for the same cause. Russell v. United States, 369 U.S. 749, 763–764, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962); United States v. Cruikshank, 92 U.S. (2 Otto.) 542, 558, 23 L.Ed. 588, 593 (1876); Sirico v. United States, 350 F.2d 310 (2d Cir. 1965). As a corollary purpose, the charging document must also inform the court of the facts alleged so that the court may decide whether they would be sufficient to support a conviction. See, e. g., Russell v. United States, supra, 369 U.S. at 768, 82 S.Ct. at 1049–1050.

■■■ While an information couched in the terms of the statute ordinarily will be sufficient, see, Spinelli v. United States, 382 F.2d 871, 888 (8th Cir. 1967); United States v. Calise, 217 F.Supp. 705, 707 (S.D.N.Y.1962), troublesome questions can arise when a court is called upon to decide whether particular facts must be pleaded.

■■■ The odd numbered counts insofar as they relate to alleged violations of section 351(a) (2) (B), characteristically charge that on certain specified dates defendants unlawfully caused a number of cartons to be introduced into interstate commerce, bound for certain named addresses, which cartons contained drugs that were labeled in a stated manner, and which were adulterated in that the methods used in, and the facilities and controls used for, their manufacture, processing, packing and holding did not conform to and were not operated and administered in conformity with current good manufacturing practice

necessary to assure their safety and reliability. While these counts might well have been more informative, the court concludes that they are sufficient, and defendants are relegated to a demand for a bill of particulars. See, 8 J. Moore, Federal Practice § 7.04 (2d ed. 1967).

Russell v. United States, supra and Van Liew v. United States, 321 F.2d 664 (5th Cir. 1963), the cases relied upon by defendants, are distinguishable from the pending proceeding. In both of these cases, the motions to dismiss were directed against indictments returned by legally constituted grand juries. The issue was whether the failure either to include certain matter or to clear up certain ambiguities in the indictments constituted merely a nonprejudicial technical deficiency, or whether it deprived the accused of significant protections which the guaranty of a grand jury indictment had intended to confer. Russell v. United States, supra 369 U.S. at 763, 82 S.Ct. at 1046–1047.

Thus, the Supreme Court in the *Russell* case declared that once it was decided that only a grand jury could have determined whether the defendants should have been held to answer in a criminal trial for certain specified acts, and when, in order to make that ultimate determination, the grand jury necessarily had to have passed upon a question relative to which the indictment was vague or ambiguous,

> [t]o allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him.

Russell v. United States, supra at 770, 82 S.Ct. at 1050. Similarly, in the *Van Liew* case the fifth circuit, after discussing the purposes of an indictment

and the function of the grand jury in the constitutional scheme, remarked as follows:

> It is the protection to the citizen against unfounded charges. Little may be left open to construction or interpretation of an indictment. If the offense is not plainly stated and is made so only by a process of interpretation, there is no assurance that the Grand Jury would have charged such an offense.

Van Liew v. United States, supra 321 F.2d at 669. These considerations are inapposite to this case, cf. 8 J. Moore, Federal Practice § 7.02 (2d ed. 1967), and the court is of the opinion that the odd numbered counts are not defective. But see, United States v. St. Louis Coffee & Spice Mills, 189 F. 191 (E.D.Mo. 1909).

Defendants further contend that counts nine, ten, thirteen and fourteen are defective because they fail to negate the permissible variations and exceptions envisaged by section 352(b).

Counts nine and ten charge, in part, that defendants shipped a drug known as cyanocabalamin, which drug was adulterated and misbranded within the meaning of sections 351(c)[19] and 352(a)[20] in that it contained less than the 15 mcgm. of cyanocobalamin which each cubic centimeter was purported to contain.

Likewise, counts thirteen and fourteen allege, in part, that a shipment of a drug known as Estradiol was adulterated and misbranded within the meaning of sections 351(c) and 352(a), in that said drug purported to contain 1 mg. of estradiol per cubic centimeter whereas, in fact, it contained in excess thereof.

Section 352(b) (2)[21] provides, however, that a drug in package form must bear a label containing "* * * an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count: Provided, That * * * reasonable variations shall be permitted, and exemptions as to small packages shall be established, by regulations prescribed by the Secretary."[22] The court rejects defendants' argument that the failure to negate the above proviso renders the subject counts defective.

Assuming arguendo that the proviso is relevant to the alleged contraventions of sections 351(c) and 352(a), it is not so inseparable from the definitions of the offenses that their essential elements cannot accurately be described if it is omitted. See, McKelvey v. United States, 260 U.S. 353, 356–357, 43 S.Ct. 132, 134, 67 S.Ct. 301 (1922); United States v. Cook, 84 U.S. (17 Wall.) 168, 176, 21 L.Ed. 538, 540 (1872); Akers v. United States, 280 F.2d 198 (6th Cir.), cert. denied, 364 U.S. 924, 81 S.Ct. 289, 5 L.Ed.2d 262 (1960); United States v. Pope, 189 F.Supp. 12, 18–19 (S.D.N.Y. 1960). The cases cited by defendants are clearly distinguishable.[23]

In the final segment of their motion to dismiss, defendants maintain that counts eight, ten and fourteen are duplicitous in that each one charges the identical offense alleged in the second part of its preceding odd numbered count. For example, count seven asserts, in part, that defendants introduced a certain drug into interstate commerce, and that such drug was adulterated in that its purity and quality fell below that which it purported to

---

19. This section provides that a drug shall be deemed to be adulterated if " * * * its strength differs from, or its purity or quality falls below, that which it purports or is represented to possess." 21 U.S.C. § 351(c) (1964).

20. Under this section, a drug shall be deemed to be misbranded "[i]f its labeling is false or misleading in any particular." 21 U.S.C. § 352(a) (1964).

21. Supra note 5.

22. See 21 C.F.R. § 1.102(j).

23. United States v. Bailey, 277 F.2d 560 (7th Cir. 1960) (exception within the enacting clause); Sutton v. United States, 157 F.2d 661 (5th Cir. 1946) (exception incorporated in the definition of the offense); Hale v. United States, 89 F.2d 578 (4th Cir. 1937) (exception within the enacting clause).

possess. It had purported to be suitable for intramuscular injection while, in fact, it was contaminated with viable microorganisms. Count eight, on the other hand, charges that the same drug was also misbranded since the statements on the vial label falsely represented that the drug was suitable for intramuscular injection.

■ Assuming that both counts rest upon a single shipment, defendants' potential criminal liabilities are restricted to one count in each of the three pairings of allegedly duplicitous counts. United States v. Success Chem. Co., E.D.N.Y., CCH Food, Drug & Cosm.L. Rep. ¶ 40,180, Feb. 13, 1964. Defendants may either demand that the Government elect, see, United States v. Ketchum, 320 F.2d 3, 8 (2d Cir.), cert. denied, 375 U.S. 905, 84 S.Ct. 194, 11 L.Ed. 2d 145 (1963), or request the court to charge the jury that, for instance, it may find defendants guilty of either count seven or count eight, but not both. See, Milanovich v. United States, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961). The decision as to whether the Government should be required to elect either at the commencement of the trial or at the completion of its case, or whether the matter should be handled by an instruction in the charge to the jury or, finally, whether the court should dismiss one count if defendants are convicted of both counts, should be left to the trial judge. Accordingly, this aspect of defendants' motion to dismiss is denied without prejudice.

Defendants' remaining applications are related to discovery and a demand for a bill of particulars.

As noted earlier, counts seven, eight, nine, ten, twelve, thirteen and fourteen charge, in part, that certain drugs introduced into interstate commerce were adulterated and misbranded within the meaning of sections 351(c) and 352(a). Defendants seek an order permitting them to obtain for examination and analysis: (1) five vials of each of the four accused drugs, including representative samples from the vials out of which the Government's tests were made, and representative samples of the printed material that accompanied the shipment; (2) copies of all scientific analysis upon which this proceeding is based, including, but not limited to, the scientific studies and other memoranda, reports, summaries and opinions of a scientific or technical nature upon which the specific allegations in the aforesaid counts are based.

The request for samples is brought pursuant to section 372(b) of title 21, which provides that

where a sample of a * * * drug * * * is collected for analysis * * the Secretary shall, upon request, provide a part of such official sample for examination or analysis by any person named on the label of the article, or the owner thereof, or his attorney or agent; except that the Secretary is authorized, by regulations, to make such reasonable exceptions from, and impose such reasonable terms and conditions relating to, the operation of this subsection as he finds necessary for the proper administration of the provisions of this chapter.

Since the government has consented to produce only the results of the analyses made on the drugs and representative samples in the form of unopened vials, the court is faced with the question of whether defendants are entitled to a portion of the sample which the government used in its tests.

■ While Triangle Candy Co. v. United States, 144 F.2d 195, 155 A.L.R. 903 (9th Cir. 1944), did not answer this precise question, the court indicated therein that section 372(b) is intended to assure defendants of an opportunity to refute the Government's analysis of the sample tested. The Government does not claim that portions of the drugs in the open vials would not be fair samples of the conditions of the drugs as originally seized. Therefore, the Government is directed to supply defendants

with such samples. The purpose articulated in the *Triangle* case would be better served by satisfying their request. The Government may be relieved of this obligation, however, upon a showing either that the balance of the tested vials are no longer available, or that changes in the conditions of the drugs in those vials would render further testing valueless.

Although defendants' demand for copies of the Government's scientific analyses upon which this proceeding rests is beyond the scope of Rule 16(a) of the Federal Rules of Criminal Procedure, such discovery is permissible under Rule 16(b) which allows a defendant discovery of documents " * * * within the possession, custody or control of the government, upon a showing of materiality to the preparation of his defense * * *." Under this subsection, defendants are not required to identify the requested documents with specificity.

It is assumed that the Government's case will rest, essentially, upon expert testimony. If the Government is in possession of reports of experts which contain opinions to the effect

(1) that the Vial Hepviron, as described in counts seven and eight, was or was not sterile, or that such determination could not be made; or

(2) that the Vial Aquaplex, as described in counts nine and ten, did or did not contain less than 15 mcgm. of cyanocobalamin per cublic centimeter, or that such a determination could not be made; or

(3) that the carton insert described in count twelve did or did not relate to the drug contained therein, or that such a determination could not be made; or

(4) that the Vial Estradiol, as described in counts thirteen and fourteen, did or did not contain in excess of 1 mg. of estradiol per cubic centimeter, or that such a determination could not be made,

it is directed to submit such reports to defendants' attorneys for inspection, copying and photographing. In addition, if the reports are based upon or refer to findings, or scientific or technical data within the Government's possession, custody or control, such documents shall also be produced.

The discovery granted defendants herein shall be conditioned upon production by defendants of any similar documents presently or hereafter within their possession, custody or control. The reports and documents shall be exchanged at the office of the United States Attorney for the Eastern District of New York at a time to be fixed by the parties upon written notice from defense counsel that defendants elect to avail themselves of discovery upon the terms and conditions set forth in this memorandum of decision and order. Of course, at the time set for the exchange of papers, either side may certify that no such report or document is either in existence or is within its possession, custody or control.

Furthermore, while no documents are to be produced which are expressly excepted by Rule 16(b), the court does not believe that the exception was intended to cover reports of experts, whether such experts are Government employees or were specially retained to test and analyze the subject drugs. Cf. United States v. Acarino, 270 F.Supp. 526 (E.D.N.Y.1967).

The Government is also directed to supply defendants, as requested, the identifying marks, if any, of the packages from which the analyzed samples were obtained. Moreover, defendants' application for permission to inspect and copy or photograph their statements or admissions, labels, cartons and inserts within the Government's possession, custody or control, the existence of which is known, or by the exercise of due diligence may become known to the United States Attorney, is granted. Such discovery shall be had at the conference to be set down for the exchange of certain reports.

The final motion in this series is defendants' demand for a bill of particulars pursuant to Rule 7(f).

 The particulars demanded in paragraphs Nos. 4 to 12 inclusive are clearly improper and are denied. Rather than serving to effectuate the "apprizing" requirement of the sixth amendment, or the double jeopardy protection of the fifth, or some other legitimate purpose, they simply seek a disclosure of the Government's case. Nevertheless, it is noted that some of the information demanded in the above particulars may be obtained by the discovery route from the reports of the testing and analysis of the subject drugs.

Paragraphs Nos. 1 to 3 inclusive relate to the Government's charges that the drugs referred to in the odd numbered counts were adulterated within the meaning of § 351(a) (2) (B) in that the methods used in, and the facilities and controls used for, their manufacture, processing, packing and holding did not conform to and were not operated and administered in conformity with current good manufacturing practice. Those items ask the Government to particularize how it claims that defendants failed to conform to current good manufacturing practice.

The Government's argument that the information pleads the charge with greater specificity than form II of the Appendix of Forms does not answer defendants' demand for greater specificity. Though the details of the shipment are adequately supplied, the information lacks the specificity of the form in pleading the manner of adulteration. It would be difficult indeed to prepare a defense to such charges without the requested particularization. Accordingly, the Government is directed to specify how defendants failed to conform to good manufacturing practice. The degree of specificity required will vary with the nature of the alleged nonconformity. Upon receipt of the bill of particulars, defendants may apply at the foot of this order for further particularization. In all other respects, the items set forth in paragraphs Nos. 1 to 3 inclusive of the demand are denied.

The Government is directed to comply with the directions herein contained within a reasonable time. The parties may apply at the foot of this order for further directions consistent with the terms of the order.

The motions, as determined, are

So ordered.